24-2689 Eastern Missouri, Angelica Woods v. City of St. Louis, Missouri, et al. Mr. Wheaton, we'll hear from you first. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, my name is Andrew Wheaton, for the appellant. Now that qualified immunity has been raised in this case, the plaintiff bears the burden to demonstrate, by citation to controlling authority, that places the matter beyond debate, that Ms. Woods, the plaintiff in this case, was free, constitutionally free, from being disciplined under this set of particular facts. The plaintiff cannot possibly meet that burden on this record, and has failed to meet that burden. The plaintiff in this case was fired for an uncontroverted, egregious violation of city policy and the city code of conduct, when she charged at a fellow co-worker, used discriminatory and harassing language, and she was appropriately disciplined for it. Was qualified immunity sufficiently raised in the opening brief to preserve the issue? Absolutely, Judge, it was. I'll note first... Well, it seems like we changed directions. We're on a different horse now than when we started, it seems. Am I wrong? Well, I would say that that is incorrect, Judge, and as much as qualified immunity was the primary point and the first point raised in the 50B motions that are specifically the subject of this appeal, qualified immunity was the argument below, repeatedly. On summary judgment, on the 50B motion at the close of the plaintiff's case, on the 50B motion at the close of all the case, and on the 50 motion afterwards, or in the alternative Rule 59. And the first line of the brief on appeal is that the district court erred in denying the 50B motion. And qualified immunity, I'll also note, was specifically raised in the appellant's primary brief on appeal. So qualified immunity has always been the issue in this case, and yes, was appropriately preserved. I'll say, Judge, that with respect to qualified immunity... Where is it raised in the appellate brief? I mean, you've got on page 25 just a general statement of law about qualified immunity, but then where's the argument about it? Well, I'll say, Judge, that that general statement of law is the second page of the first point of argument on appeal, and there's a... That just says the applicable legal standards. Well, I... You're just summarizing the applicable legal standards for judgment as a matter of law and qualified immunity, but then I'm wondering where the argument is that we were entitled to qualified immunity. Yeah, well, and I'll admit only, Judge, that it could have been expounded upon further, but given that it was a primary argument in the 50B motion that's the subject of the appeal, that the qualified immunity was raised... Well, there were multiple grounds raised in the 50B motion, though, so you don't... Well, I'll say there were... Go ahead. With respect to the first 50B motion and the second, both of which are subject of appeal, there were two points, two primary points that were raised. The first was that there was no protected speech. The second was that Wilson's entitled to qualified immunity, and those were the two arguments subject of the motions that were... or the denials that were appealed. What about our cases that talk about a failure to meaningfully argue the point in the opening brief? Well, I'll... Because, I mean, where's... I mean, like, the question I've been asking and I think Chief Judge Kalten is asking is, like, where's the argument? And I see the argument plainly in a reply brief. I don't see the argument anywhere before that, on appeal. Yeah, so I'll say, Judge, that it, again, was raised in the appellant's initial brief, and I believe later on in the brief there's another reference to entitlement to qualified immunity. But I'll say, with respect to the argument, it was clearly understood by the other side in this case because they addressed qualified immunity in their response brief and argued, no, he's not entitled to qualified immunity and here's why. So I don't think there's any... That alone, to me, indicates that it was appropriately raised. The other side understood that it was raised and responded to that argument substantively, which is probably because it was the argument on all of the motions below, on summary judgment, 50B, and so on, all the way through appeal. So, again, qualified immunity was raised, and merely referencing it in the appellant's brief, as was done, is sufficient to inject the issue under established law and shift the burden here to the other side to respond. So that's the appellant's position. Well, if the employer terminated the plaintiff for protected speech, what's not clearly established about that? Well, I'll say that that assertion, like the district court's reliance below, is impermissibly phrased at too high a level of generality, which contravenes this Court's and the Supreme Court's precedent on that point. What is more granular in this case that would make the case novel? Well, number one, that there was an uncontroverted violation of city policy, and this Court has repeatedly, in multiple cases over the years, held that an intervening violation of company policy, or in this place, government policy, severs any causal connection between protected speech and the adverse employment action. Well, but isn't that a jury question in this case? Wasn't the jury required to decide whether the defendant terminated her because of the protected speech or because of the intervening misconduct? No, it shouldn't have been, Judge, because the 50B motion should have been granted at the close of the evidence on qualified immunity grounds, which is, again, the issue on appeal. All right, well, if that's your argument, what I mean is if that didn't happen, so the case went to the jury, and I understood the jury was then asked to decide what was the motivation for the termination. Right, and again, should not have been. Now, the jury's verdict, I understand. That's what I don't understand is why not? I mean, let's say the evidence was clear that the plaintiff was terminated for the speech, not for the conduct, and the jury believed that's what happened because they didn't believe Wilson, then why wouldn't it be clearly established that her rights were violated, if those were the facts? Because if you put yourself in Wilson's shoes as a government supervisor who is tasked with and understands his duty to be to hold employees accountable, and he, in fact, could have been subjected to discipline for not holding this employee accountable, that the only thing he would have reasonably understood as a government official is I have to discipline this person. I can't let this slide, and that's the applicable analysis when it comes to the qualified immunity. Would a reasonable official have understood that what I'm doing violates clearly established law? Absolutely not. He would have understood the opposite. It's my job to hold employees accountable. I have to hold this person to the code of conduct, and I have to discipline them. What if the jury didn't believe that that's why he acted? Well, I'll say we don't think he would have disciplined her but for the speech. Well, I'll point the court to multiple decisions over the years. I mean most recently in Thomas v. Marshall Public Schools, Green v. Franklin National Bank of Minnesota, Keele v. Select Artificials, Inc. in 1999 where the courts repeatedly held that an intervening incident, which is a policy violation, severs a causal connection. So, again, the case should not have been submitted, and that the jury went against the city or against Wilson in this fact is indicative of the prejudicially errant admission of evidence that inflamed them, but never, again, never should have been admitted either. So are those summary judgment cases you mentioned? Yes. As a matter of law, the evidence of causation was insufficient because of this severing? I believe they all are except that one may have been decided on a motion to dismiss, not on summary judgment. But the intervening conduct in those cases was much less egregious than the conduct here. In Thomas, most recently, the intervening conduct was this plaintiff in Thomas had passed out LGBTQ pride stickers and put up pride flags as a school employee, and then the intervening conduct was that there were general complaints about her leadership style, and the court held that, well, there's an intervening justification for the adverse employment action here, and it was just that there had been substantiated complaints about leadership style. But this is a different case, both factually but just on its posture. Now, if you look at what happens, the summary judgment motion is denied, no appeal is taken interlocutorily, and so it then proceeds to trial. Once the case proceeds to trial, we start looking at the evidence in a light most favorable to the jury's verdict, including the jury's verdict that the reason for termination was exercise of her First Amendment rights. And what you seem to be asking us to do is to stand that traditional standard on its head and have us view the facts in a light most favorable to Mr. Wilson. What you're doing is you're saying that we are going to discount what Woods claims and what her evidence showed, and we're going to put greater weight on your evidence than to say that it wasn't clearly established and that she was entitled to or that summary judgment would have been proper in the case. And it just seems to me that once the issue and the fact question is presented to the jury, then some deference must be given to that jury's decision. Am I wrong? With respect to us asking the court to view the evidence in a light most favorable to Wilson, that's not what we're doing, Judge. Well, you kind of are, because what happens is that Woods offers up an explanation about the illegal wiretapping, that she did it for her own purposes and she put her phone down in a common area that was plainly visible, and the jury could have credited that testimony. You want us to discount that. There's a question about providing false information to a customer, but Woods testified she never provided that testimony, that she never told the customer that the bag had been stolen by a tow lot employee. And then the verbal altercation, you've got the testimony of both parties, but you also have the video of it. Now, you can't hear what was, you know, but, and so, I mean, it seems like you want us to kind of point by point put a thumb on the scale when the jury may have found those issues the other way. Well, I'll say first, Judge, that the conduct itself was uncontroverted, and I'll say that even the plaintiff in this case on cross-examination at trial, even the plaintiff admitted that discipline was appropriate for her conduct, which is a stunning admission in a case where Wilson was charged with and found to have violated clearly established law that no reasonable person would have known of. You know, I'd like to hear your argument on the admission of the pre-termination hearing recording as evidence. I understand you to be making a separate evidentiary argument. Correct, Judge. An incredibly prejudicial admission of irrelevant evidence that amounted to just a 42-and-a-half-minute tirade of argument that did not constitute evidence at all, that referenced things that weren't fact, that weren't in the record, including perhaps most egregiously reference to a $1.1 million settlement that had nothing to do with this case, with a black police captain that the jury never should have heard about. And then an article, a hearsay article, about that settlement was likewise admitted into evidence. Was there other evidence separate from this recording that Woods' attorney had informed Wilson that Woods was speaking with the media? No, none, Your Honor. Well, that doesn't help you then, because that means there was probative value to the record. Maybe I misunderstood your question. Was there separate evidence that he knew she was speaking to the media aside from the… I understood Judge Perry to be saying, or maybe, I don't know if Judge Perry said it quite this way, I understood one of the arguments for admitting the recording is that it showed that Wilson was put on notice that the plaintiff was speaking to the media, because that's a relevant fact in the case. And I understood that was why there was at least some probative value to the recording. And my question to you was, is there other evidence that Wilson was put on notice of that, separate from the recording, such that the recording was redundant? And you said no. Well, yeah, and I have to stick by that. I mean, I would say that there may have been some general evidence that he was aware of a media report coming out, but he didn't know that it was Woods who spoke. So then why isn't, though, then the recording, it has some probative value, it sounds like, if it was relevant on that point. Sure, but limit it to that. Well, that's a good thought, but I didn't see in the record that the defense had proposed redaction or any kind of limitation. It seemed like it was sort of an all or nothing choice for the judge. No, it's a fair. Am I right about that in the record? You know, and I'm not certain about the record. I wasn't the attorney at trial here, but I think generally that's correct. But still, the objection was made and it was preserved. We've got 30 seconds. I want to address one issue, which is that it's a threshold matter that was the number one argument in our 50B motion, that these internal complaints, and even up to the media, were not protected speech as a matter of law. In 2006 in Garcetti, the Supreme Court said that when an employee speaks pursuant to official duties, that's not protected speech. In Thomas, same result. And I want to specifically point the cart to Mogard v. City of Milbank, 932 F3D 1184. Again, holding that complaints by a government employee are not protected speech. Lyons v. Vaught in 2017, the same result. And Noon, which the district court impermissibly relied on at a high level of generality, number one, decided after the fact in 2024. And number two, there was no evidence that the employees were required to make the complaints that they did. And there is evidence here. It was a code of conduct requirement that the plaintiff engage in the speech that she did. So I wanted to make that point as well, but I see I'm out of time, Your Honors. We appreciate it. And we'll ask that the district court's determination be reversed. Very well. Thank you for your argument. Mr. Casper, we'll hear from you. Good morning. The police and the court. On the issue of qualified immunity, as was brought up just now, the issue of knowingly violates the law is what's important in this case. And it's clear that Mr. Wilson knew that an employee has a right to free speech under the First Amendment. That's what this case is about. So qualified immunity really isn't an issue here. There's this issue of my client engaging in an altercation with the coworker. They're saying this is an intervening event that somehow absolves them of their duties under the First Amendment. And that's just not true in this case. My client had an altercation with a coworker. The coworker was not terminated. The coworker did not make these complaints under the First Amendment like my client did. That's what distinguishes the two. Now, Mr. Wilson, he conducted this pre-termination hearing. He had never done this for any other employee in his entire career. The only time he ever did it was with my client, the one who had been complaining. And she had complained to him back as early as November. He just basically ignored her complaints. He said that he didn't really know what she was complaining of, but he clearly knew that she was making these complaints. He acknowledged that in the trial. So for them to say that there's an intervening event, that goes back to the jury issue. The jury can weigh all the facts. They heard that Mr. Wilson knew my client had made these complaints. And there were at least five different groups that she was complaining to. But Mr. Wilson was aware of this. He had talked to the comptroller's office about these complaints at the pre-termination hearing. He heard about the news story that was coming out. And it's very important to look at the timing of events. Once again, he knew that she was making some complaints before the pre-termination hearing, but he didn't know about the news media, for instance. He chose, though, to conduct this pre-termination hearing himself. Now, the pre-termination letter was written by Mr. Flake, who was in charge of the tow division. He was commissioner of streets. And he was directly below Mr. Wilson. So Mr. Wilson signed off on the letter, but he didn't draft it. The city tried to make an argument that the decision to terminate Ms. Woods was apparently made before this pre-termination hearing, which has serious due process issues. If they're going to make that argument, that they make the decision before the pre-termination hearing, I think every city employee that has a pre-termination hearing would have a due process case against the city. Clearly, if you look at the documents, the letters that were signed off on by Mr. Wilson, the first one was January 20th, which gives notice for the pre-termination hearing. And it specifically says the city is considering your dismissal. And then you have the actual pre-termination hearing on February 1st, in which Ms. Petruska says, Ms. Woods went to the media, and there's a news story coming out on KSDK. And that story came out on February 4th. And then on February 5th, Mr. Wilson issues a letter of termination to my client, where he says the words, it is my determination your employment with the city is terminated. So he didn't make the decision until after the pre-termination hearing. So I think that's important to note. I think all of that goes into the issue of punitive damages, which was an issue with the appeal. The jury heard all the evidence. They saw the timing of the events. They saw that these actors, Mr. Flake, Mr. Wilson, and some other employees were all close friends, and Ms. Woods was complaining about them specifically, and they didn't like that. And that's why the jury came back with the award of punitive damages, which is a jury issue. So on those grounds, clearly the verdict should stand. Which is the protected speech in your view, the speech to the media or the internal complaints or both? Well, there were multiple. So there's five different ones, and this was part of the jury instructions in the verdict form that we included in our appendix at 27. And there were these special interrogatories that were given to the jury. The first was, did plaintiff report to her supervisors in the tow lot that coworkers were engaging in the unlawful sale or transfer of vehicles at the city tow lot? And then it asks whether Mr. Wilson was aware that Ms. Woods made these complaints. And there was a similar question for her complaints to the comptroller's office, a similar one for her complaints to the personnel department, a similar one to her complaints to Mr. Wilson directly, and then a similar one for her complaints to the news media. So each of these independently would give her a plaintiff's verdict in this case. In this case, the jury came back in all five instances in her favor. So could you go back to my question about protected speech? They're each protected speech, yes. Okay. What about the argument that at least as to the internal complaints under Garcetti and the like, it's not clearly established that it's protected? This goes to her duties. What are her duties? Her title is clerk. Might have been clerk one or clerk two, but her actual duties, she was assigned as a dispatcher in the tow division. So a report would come in about a stalled vehicle. She would assign it to a tow driver who would go pick up the vehicle and bring it back to the lot. That's what her job was. So your point is that the speech was not about her job duties but about a separate matter of public concern? Matter of public concern. This is reporting theft of the tow lot. They're stealing public funds. They're giving personal tow rides to their friends off the clock or on the clock. I understand the argument. What about this recording, this 42-minute recording of the former lawyer? Why isn't that a problem under Rule 403 at a minimum? It goes to the notice of Mr. Wilson because he was denying that he had knowledge of a lot of this. A lot of what, though? There was a lot of stuff in that recording that wasn't about her complaints to him or to the media. He's trying to say that he didn't have knowledge of complaints of the tow lot itself, and that's why these prior articles were relevant because there's a long history of this. There's a long history of the city essentially ignoring this. That's why the testimony of the other comparators. Isn't it problematic that the jury was given this 42-minute discussion by a plaintiff's lawyer about all kinds of other problems supposedly at the tow lot or in the city that don't have anything to do with the points you just raised? I don't think there are any other problems not directly related to this case. There was stuff about racial discrimination. She had some complaints. My client issued a series of complaints. The city has a policy where you can raise a grievance. I don't remember how many exactly, but there was a lot of these grievances. In some of these grievances, she issued racial issues and things like that. Why shouldn't that have been kept out? That has nothing to do with this case as I understand it. As you brought up earlier, there wasn't any motion to sever those issues. But doesn't the court itself have an obligation under Rule 403, whenever a piece of evidence that's offered that's probative, to consider whether or not its probative value is outweighed by its substantial prejudice, unfair prejudice, right? Don't judges all the time say, yeah, okay, I'm going to let this in, but I'm going to redact these portions, even when nobody suggested that. I've tried 300 jury trials in my lifetime as a judge presiding over that number. I have done that numerous times. The question is, did Judge Perry abuse her discretion when she failed to redact parts of that 42-minute recording that are not relevant to the issues that were pled in this case? Absolutely not. She did consider redaction, and she decided against it. Why? Did she give a reason? I think partly it was an issue of the time involved. I don't think the defendants— Too much work to go through and redact it? There was that issue. Do you know what you mean by time? Efficiency of the court. The defendants didn't identify specific parts of the record that they wanted to be redacted. Judge Perry did keep out some of the exhibits that were used at that hearing. She did take this into consideration. She did redact some, and I know that there was a balancing done. That's why the question was directed, did she abuse her discretion? Absolutely not. Then you said no, and you've now explained why not. I do have one question about the legal duty issue. That question really is this. Doesn't every single employee of the city have a duty to report theft by co-employees if they know it exists? That's not part of her duty. This doesn't have it in the manual. It's not enforced because then everybody in the tow lot who didn't report this stuff should have been fired. Perhaps they should have been. I find it hard to believe that if you work in a government agency, that if all kinds of guys around you that are stealing from the people of the United States or the people of the city of St. Louis, that every employee doesn't have a duty to go to their superior and say, wait a minute, those guys are stealing. Right. Well, even if there's this internal duty, say reporting to the comptroller's office was part of her official duties. Going to the news media is not. There's no part of that that says you have to go to the news media. And that is likely. I understand that argument. But the question is that is the admission of that other stuff then harmless error? Is that what you're claiming? It's harmless because the jury still came back with a verdict, director, in her favor on the issue regarding her reports to the news media as well. And that would be sufficient to sustain and support the ultimate verdict and the claim for damages?  And to my knowledge. All the damages? You don't think it would make any difference on the damages if it was only the media reports? She only has one set of damages though. Which is for the termination? The termination, lost pay. She's not double dipping. She doesn't have separate damages for each violation. Okay. What about the punitive damages? Are they oriented toward the power of misconduct by the defendant? The egregiousness of Mr. Wilson's actions are the same regardless of who the reports are to. It's a First Amendment violation. And then just going back to the duty. If she had a duty to report, typically my understanding is it's report to her supervisors. It's not report to the comptroller's office and all these other departments, personnel office. It's a single report and the fact that she's doing it multiple times is going outside that requirement, required duties of the city's policies. Anything else? Checking my notes quickly. All right. You may. Going back to the matter of public concern that the defendants brought up. The case law is pretty clear. That when it involves institutional integrity, such as financial mismanagement or corruption within a public body, that that is a matter of public concern. So we cited the Noon v. City of Platte Woods, Missouri case. And then on their issue of, they cited this in the 28-J letter, Thomas v. Marshall Public Schools. And that case references the intervening events. And it specifically says intervening events do not automatically negate causation. And then causation, once again, is something that the jury gets to consider. It's something they heard all the evidence and they made their decision. So I just wanted to get those points across. I appreciate your time. Thank you. Thank you for your argument. And thank you to both counsel. The case is submitted and the court will file a decision in due course.